## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and** | ) | |
| **PEOPLE OF THE VIRGIN ISLANDS** | ) | |
| **v.** | ) | **Criminal No. 2017-0010** |
| | ) | |
| **JAHEEM BENJAMIN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ———————————————————— | ) | |

**Attorneys:**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Omodare B. Jupiter, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Jaheem Benjamin's ("Defendant" or "Benjamin") "Motion to Suppress Tangible and Derivative Evidence" (Dkt. No. 27) and "Motion to Suppress Statements" (Dkt. No. 28) (together, "Motion to Suppress"); the Government's omnibus opposition thereto (Dkt. No. 32); Defendant's "Response to Government's Opposition to Motion to Suppress Evidence" (Dkt. No. 34) and "Response to Government's Opposition to Motion to Suppress Statements" (Dkt. No. 35); testimony at the suppression hearing; Defendant's supplemental briefing (Dkt. No. 67); and the Government's amended supplemental response (Dkt. No. 74). For the following reasons, the Court will deny Defendant's Motion to Suppress.

# I.    BACKGROUND

On March 7, 2017, the Government filed an Amended Information against Benjamin charging him with the following counts: (1) Manufacture of Marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D); (2) Possession of Marijuana with Intent to Distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D) and; (3) Illegal Use of Utility Equipment, in violation of 14 V.I.C. §§ 1263(b)(1) and (3). (Dkt. No. 12).[1]

At the suppression hearing, Drug Enforcement Administration ("DEA") Special Agent Jeremy Latchman ("SA Latchman") testified, and three Government exhibits were admitted into evidence: (1) a Consent to Search form ("Consent Form"); (2) a DEA Recording Declination form; and (3) an Advice of Rights form. See Government Exhibit Numbers ("Gov't Ex. No.") 1-3. All three forms were signed by Defendant and SA Latchman. One Defense exhibit was admitted into evidence: a Report of Investigation prepared by SA Latchman. See Defendant Exhibit Number ("Def. Ex. No.") 4. Unless otherwise specifically indicated, the facts recounted herein come from the testimony of SA Latchman and the exhibits admitted into evidence. The following facts emerged from the record established at the suppression hearing.[2]

On February 14, 2017, Task Force Officer ("TFO") Moses President ("TFO President") from the DEA St. Croix Resident Office received a tip from an anonymous Source of Information ("SOI") concerning an alleged marijuana cultivation operation at a residence located at 92 Upper

---

[1]  Prior to the Amended Information, the Government initiated this action against Benjamin by filing a Criminal Complaint on February 14, 2017. (Dkt. No. 1).

[2]  The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of these pretrial motions, ever mindful that Defendant Jaheem Benjamin is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

Love, Fredriksted, St. Croix. (Dkt. No. 1-1 at 1). The SOI reported that there was a structure behind the residence which contained the marijuana. *Id.*

TFO President had personal knowledge of where the property was located and the identity of the possible residents—one of whom was Keisha Benjamin. Ms. Benjamin was a police officer with the Virgin Islands Police Department ("VIPD") and was Defendant's sister. Following up on TFO President's information, SA Latchman and TFO Donnel Samuel ("TFO Samuel") contacted Ms. Benjamin at approximately 11:40 a.m on February 14, 2017. (Def. Ex. No. 4 at 1). TFO Samuel advised Ms. Benjamin of the information they had received and requested her cooperation in the investigation. Ms. Benjamin agreed to cooperate and accompanied SA Latchman and TFO Samuel to the residence.

Upon arriving at 92 Upper Love, Ms. Benjamin informed the officers that, while she used to live there, she had recently moved out and that her brother "lives at the home and would probably be home." [3] SA Latchman and TFO Samuel asked Ms. Benjamin to call her brother and, if he was home, to ask him to come out. Ms. Benjamin complied with their request. When Defendant came out of the house, he was greeted by SA Latchman, TFO President and TFO Samuel—all of whom had stepped out of their vehicles and were standing in the driveway with Ms. Benjamin. [4]

Once Defendant approached them, TFO Samuel and SA Latchman told him they were there because they had received information regarding marijuana being grown on the property. SA

---

[3]  Prior to their arrival, another group of officers, which included TFO President, went to the residence but was unsuccessful in contacting anyone at the residence.

[4]  Sometime after SA Latchman, TFO Samuel, and Ms. Benjamin arrived at the residence, at least five other law enforcement officers joined them—a group comprised of TFO President, Special Agent Mark Cory, TFO David Wyrzykowski, TFO Elskoe, and TFO Desormeaux. TFO President joined SA Latchman and TFO Samuel on the driveway.

Latchman and TFO Samuel asked Benjamin for his cooperation "to conduct a search and retrieve the marijuana plants." SA Latchman told Benjamin that "he can voluntarily provide [them] assistance." At this stage, none of the officers had drawn their weapons,[5] accused Benjamin of any crime, told him he was under arrest, or told him he could not leave. SA Latchman also characterized his tone with Benjamin as conversational.

In response to the officers' requests, Benjamin stated that he would cooperate and "explicitly" consented to the search. Benjamin then walked towards the right side of the residence onto a well-worn pathway. SA Latchman asked Benjamin where he was taking them, and Benjamin responded, "it's just a few plants or a couple of plants." The officers followed Benjamin onto the path, walking single file towards the rear of the residence. SA Latchman was about five to six feet behind Benjamin, and he was immediately followed by TFOs Samuel and President. The path was surrounded by some debris and grass that was about one to two feet high. While the path was the easiest way in and out, it was not the only ingress or egress to the rear of the house. Access to the back was also achievable by just "walking on the grass" or "[going] around the other way" towards the back of the house. While Benjamin led them on the path, none of the officers drew their weapons, touched Benjamin, yelled at him, or asked him any questions.

At the rear of the residence, SA Latchman saw a smaller wooden structure separated from the main house. As they approached the shed, SA Latchman smelled a strong odor of marijuana, heard and observed air conditioner units, and saw electrical wires running from the building—all of which indicated to SA Latchman a marijuana growth operation.

---

[5] SA Latchman testified that while he had a firearm on his person, it was concealed. He testified that TFO Samuel also had a concealed weapon. SA Latchman further reported that he was in plain clothes that day.

Benjamin walked up to the door of the shed and—without being instructed by SA Latchman or the other officers—unlocked it with a key and proceeded to open the door.[6] Before Benjamin could enter the building, SA Latchman asked him if the officers could go in first. Benjamin said there was no one inside, but SA Latchman told him that, for the officers' safety, they would prefer to enter first. According to SA Latchman, Benjamin assented to the officers going in first.

Six to seven officers on the scene participated in clearing and searching the shed. SA Latchman and Benjamin remained outside the shed and stood on an open grassy field about 10 to 15 feet away from the building. While waiting for law enforcement to complete the search, Benjamin walked around unrestrained. Benjamin remained untouched by any of the officers; did not have weapons drawn on him; was not yelled at; and did not have his path blocked by officers. Benjamin also had not been questioned or accused at this point.

After the other officers cleared and searched the shed, they called out that they had discovered marijuana. SA Latchman told Benjamin that he was under arrest and would be transported to the DEA's office. Benjamin requested to get some personal items from the house before they left, and SA Latchman agreed. SA Latchman, Benjamin, and at least one other officer went inside the residence. SA Latchman stated that although Benjamin was in custody at this point, he was not physically restrained.

Once inside the residence, SA Latchman was standing in the living room when he pointed out to Benjamin and the other officer vials on the floor containing what he believed to be

---

[6]  In his Report of Investigation, SA Latchman noted that right before opening the door, Benjamin stated that he had approximately 50 plants inside. (Def Ex. No. 1 at 2). However, the record shows that 137 plants were discovered. (Dkt. No. 1-1 at 2).

marijuana. According to SA Latchman, Benjamin stated that was his marijuana.

After Benjamin collected his personal items, he was escorted by SA Latchman to TFO Samuel's vehicle. Before Benjamin was placed inside the vehicle, Benjamin signed a Consent Form. A Consent Form, dated February 14, 2017, was admitted into evidence and reflected Benjamin's signature, as well as that of SA Latchman and TFO Samuel.[7] The form further reflects that it was signed at 12:15 p.m. SA Latchman testified that he did not force Benjamin to sign the form. After Benjamin signed the Consent Form, SA Latchman patted Benjamin down for weapons and handcuffed him. SA Latchman then placed Benjamin in the front passenger seat of the vehicle, while SA Latchman sat behind Benjamin and TFO Samuel drove.

While inside the vehicle, SA Latchman verbally advised Benjamin of his *Miranda* rights by reading them from an Advice of Rights Form.[8] SA Latchman then asked Benjamin the two questions listed on the form: (1) Do you understand your rights? and (2) Are you willing to answer some questions? Benjamin said yes—not to each question, but after both questions were asked. SA Latchman testified that he did not tell Benjamin that he had to sign the form, nor did he threaten Benjamin in any way to get him to waive his rights and agree to speak. SA Latchman then advised

---

[7] The Consent Form reads as follows:
   1. I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION TO SEARCH 92 UPPER LOVE, FREDRIKSTED, VI, INCLUDING DETACHED SHED.
   2. I HAVE NOT BEEN THREATENED NOR FORCED IN ANY WAY.
   3. I FREELY CONSENT TO THIS SEARCH.
(Gov't Ex. No. 1).

[8] According to SA Latchman, he read the *Miranda* rights verbatim from the form. The form states: "You have the to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish." (Gov't Ex. No. 2). Each *Miranda* statement was preceded by a blank box, which contained no marks. *Id*.

Benjamin that he would be provided with a copy of the *Miranda* form that was read to him once they arrived at the DEA office. SA Latchman also asked Benjamin if he wanted his interview recorded and Benjamin declined. SA Latchman proceeded to question Benjamin in the vehicle and Benjamin allegedly made several incriminating statements in response.[9]

Once the parties arrived at the DEA office—which was about 15 minutes later—SA Latchman provided Benjamin with a copy of the Advice of Rights form[10] that he had read to him in the vehicle and a copy of the Recording Declination Form.[11] SA Latchman stated that Benjamin

---

[9] While there was no testimony at the hearing regarding what Benjamin said, SA Latchman's Report described that Benjamin made the following statements: that the marijuana plants belonged to him; that he had harvested marijuana from the plants about two times before; that he planted the marijuana plants to make a living; that he sells a gram of marijuana for $20 (depending on whether he knew the buyer); and that a pound of marijuana is sold for $2,500. (Def. Ex. No. 4 at 3). SA Latchman also reported asking Benjamin if he had assistance in setting up the operation because the electrical work appeared professionally done and Benjamin stated that he did not want to get anyone else in trouble. *Id*. Benjamin also stated that he did not know whether the electrical wiring to the shed bypassed the monitoring meter and that his father paid the electrical bill, which he estimated was $200 per month. *Id*.

[10] The Advice of Rights Form contains a section titled "Waiver of Rights," which reads as follows:
> I have read or someone has read to me this advice of rights and I understand what my rights are. At this time, I am willing to freely and voluntarily answer questions without a lawyer present.

(Gov't Ex. No. 2). The form shows that an "x" was placed before each of the phrases "I have read" and "someone has read." *Id*. The form also reflects Benjamin's signature, as well as SA Latchman and TFO Samuel's signatures as "witnesses," and an indication that it was signed at 12:25 p.m. *Id*.

[11] The Recording Declination Form reads as follows:
> 1.  I, Jaheem Benjamin understand that the Drug Enforcement Administration (DEA) is required to audio or video record my interview.
> 2.  I do not want my interview to be audio or video recorded.
> 3.  I am willing to make a statement and answer questions only if there is no audio or video recording.
> 4.  I have read this form or someone has read it to me and I understand it.

(Gov't Ex. No. 3). The form also reflects signatures for Benjamin, SA Latchman, and TFO Samuel on February 14, 2017 at 12:55 p.m. *Id*. According to SA Latchman, Statement No. 2, which pertained to Benjamin's desire not to be recorded, was underlined by Benjamin.

read the forms and signed them. SA Latchman testified that he did not force Benjamin to sign the forms.

## II.     DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

In his Motion to Suppress, Benjamin alleges that the searches conducted on the home and the shed were unlawful because: (1) the Government failed to prove that Benjamin had authority to consent to the search of the property;[12] (2) any consent given was not voluntary; and (3) Benjamin's "substandard [living] conditions," should have placed the authorities on notice that he may not have the mental capacity to voluntarily consent to a search. (Dkt. No. 67 at 7-9).

In its opposition, the Government argues that it has established that the "agents had a reasonable and objective belief that [Benjamin] resided [at the property] and had the authority to grant the consent to search." (Dkt. No. 74 at 2). The Government also disputes Benjamin's argument that his consent to search was involuntary, *id*. at 2-3, arguing that "no competency issue [was] raised or demonstrated," and that Benjamin's signed Consent Form indicates that he gave his consent to search voluntarily by "verif[ying] and validat[ing] [his] oral consent." *Id*. at 3.

### A.     Applicable Legal Principles

The Supreme Court has long established that "the search of property, without warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment." *United States v. Matlock,* 415 U.S. 164, 165–66 (1974). A finding of consent is proper if "voluntary consent has been obtained, either from the individual whose property is searched . . . or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citing *Matlock,* 415 U.S. at 171). "Common authority rests

---

[12]  Benjamin further argues that "the search of the home (and subsequent admissions) came as a result of the unlawful search of the shed"—both of which constituted "'poisonous fruit,'" that must be suppressed.  (Dkt. No. 67 at 9).

not on property rights but 'rather on mutual use of the property by persons generally having joint access or control . . . so that it is reasonable to recognize that any of the cohabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.'" *United States v. Stabile*, 633 F.3d 219, 230-31 (3d Cir. 2011) (quoting *Matlock*, 415 U.S. at 170). The Government has the burden of establishing by a preponderance of the evidence that common authority exists. *Rodriguez*, 497 U.S. at 181; *Matlock*, 415 U.S. at 177.

The determination of whether a consent to search was made voluntarily is based on analyzing the "totality of the circumstances, including the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment.'" *United States v. Mendoza*, 334 F. App'x 515, 517 (3d Cir. 2009) (internal citation and quotation marks omitted); *see also United States v. Ortiz*, 483 F. App'x 712, 716 (3d Cir. 2012) (same). "[T]he setting in which the consent was obtained and the parties' verbal and non-verbal actions" are also relevant considerations in determining the voluntariness of the consent. *United States v. Kellam*, 2015 WL 6560637, at *6 (M.D. Pa. Oct. 29, 2015) (citing *United States v. Givan,* 320 F.3d 452, 459 (3d Cir. 2003)). The issue of coercion is key because "[f]undamental to the concept of voluntariness is that consent must not be coerced." *Kellam*, 2015 WL 6560637 at *6 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). The Government bears the burden of proving that the consent was voluntary by a preponderance of the evidence. *United States v. Cabrera*, 2007 WL 1575014, at *2 (M.D. Pa. May 31, 2007) (citing *United States v. Velasquez,* 885 F.2d 1076, 1081 (3d Cir.1989)).

## B.    Analysis

The Court finds that the Government has established by a preponderance of the evidence that Benjamin had authority to consent and voluntarily consented to the search that occurred here.

As an initial matter, the evidence supports a finding that Benjamin had common authority to consent to a search of the property—which included the house and the shed—because the facts as revealed to the officers "warranted a reasonable belief" that Benjamin "had access to and control over [the property] for most purposes." *United States v. Murray*, 821 F.3d 386, 392 (3d Cir.), *cert. denied,* 137 S. Ct. 244, 196 L. Ed. 2d 185 (2016). Those facts were recounted by SA Latchman—whose testimony the Court credits.

SA Latchman testified that Benjamin's sister told the officers when they arrived at the property that, while she used to live at the home, her brother now resided there and that he should be at home.[13] Indeed, Benjamin was, in fact, at home because when his sister called him to come out, Benjamin came out of the residence and walked down the driveway towards her and the officers. After being informed of the officers' investigation into marijuana growth on the property and consenting to a search, Benjamin led officers to the rear of the house and to the shed—which seemingly confirmed that, at the very least, he knew of the marijuana operation and its location on the property. Benjamin then walked over to the shed and unlocked the door with a key, thereby exercising and demonstrating his access and control over the premises. Taken together, these facts as revealed to the officers—wherein the officers possessed information that Benjamin lived at the

---

[13]  Benjamin seeks to cast doubt on the veracity of his sister's statement that he lived at the home by arguing that his sister made this statement only after she was "well aware that she was the person suspected of growing marijuana." (Dkt. No. 67 at 7). While SA Latchman conceded that, initially, their suspect for the marijuana growth operation was Benjamin's sister, there is no evidence that she was "well aware," of that fact. In any event, Benjamin's actions with the officers, as described below, gave credence to his sister's statements.

residence; that Benjamin came out of the house and greeted the officers; that Benjamin escorted the officers around the property; that Benjamin demonstrated knowledge where the marijuana was located; and that Benjamin opened the locked door of the shed with a key—are sufficient to show that it was objectively reasonable for the officers to believe that Benjamin had common authority over the premises and was thus empowered to consent to a search of the property. *See Matlock*, 415 U.S. at 167 (finding that an individual had common authority to consent to the search of defendant's residence where she was present in the house just prior to the search, officers knew she lived there, and because she told officers that she and the respondent occupied the east bedroom of the house).

The Court also concludes that Benjamin's consent was voluntary based on the totality of the circumstances here. The evidence revealed the following: that Benjamin was never physically touched or restrained by the officers; Benjamin was not accused or threatened with arrest, until after the marijuana plants were found and he was told he was under arrest; the officers' encounter with Benjamin was not hostile, i.e., none of the officers yelled at him nor did they have their guns drawn; and there was no evidence that the officers subjected Benjamin to prolonged questioning. *See United States v. Bailey*, 2015 WL 327198, at *5 (D.V.I. Jan. 23, 2015) (finding that defendant voluntarily provided his consent to search where, *inter alia*, no guns were pointed at defendant; no one threatened arrest; and no one raised their voice). Moreover, although SA Latchman described the house as "trashed," there is no evidence suggesting that Benjamin's age, intelligence, or educational background rendered his consent involuntary. The voluntariness of Benjamin's consent is further indicated by the fact that, even after being informed of the reason why the officers were at the residence and being told that his assistance was "voluntary," Benjamin chose to assist the officers in their search by leading them to the shed. On his own volition, he unlocked

the shed with a key in his possession and allowed the officers to enter it. *Stabile*, 633 F.3d at 231 (finding defendant's consent to search was voluntary where defendant, *inter alia*, assisted the officers in their search of the house by leading them to several computers and, later, providing one officer with a screwdriver to help remove a hard drive.); *see also United States v. Jones*, 2016 WL 3067010, at *15 (W.D. Pa. June 1, 2016) (finding defendant gave a voluntary consent to search when he, *inter alia*, provided authorities specific directions to the locations of the three firearms in his house); *United States v. Candella*, 469 F.2d 173, 175 (2nd Cir. 1972) ("[The defendant's] statement that the guns were in the containers was the equivalent of his opening the containers for the agents' inspection."). Finally, the fact that Benjamin signed the Consent Form, which affirmed that he had "not been threatened nor forced in any way" and that he "freely consent[ed] to this search," buttresses the finding that Benjamin's consent to search was voluntary.

The Court dismisses Benjamin's argument that his consent was involuntary because officers "utilized" his sister to "lure" him out of the house and to consent to the search. (Dkt. No. 67 at 8). There is nothing in the record to suggest that the presence of Benjamin's sister had a coercive effect such that a reasonable person would have felt required to cooperate. The Court also dismisses Benjamin's argument that, because he was not informed that he was a suspect for the marijuana operation nor advised of his right to refuse the search, his consent was involuntary. There is no requirement that one's status as a suspect be disclosed. *See e.g., United States v. Hernandez*, 872 F. Supp. 1288, 1296 (D. Del. 1994) (to determine whether defendant's consent to search his vehicle was voluntary, court did not factor in whether defendant was advised that the officer suspected him of being involved in drug trafficking, despite defendant being initially pulled over for a traffic violation). In any event, because the officers informed Benjamin of the information they had received pertaining to marijuana being grown on the property, and asked for

his cooperation "to conduct a search and retrieve the marijuana plants," Benjamin was certainly on notice that the officers were there to conduct an investigation, regardless of whether they considered him a suspect or told him he was a suspect. Further, it has been established that "the Government need not inform the subject of his right to refuse consent." *Stabile*, 633 F.3d at 231 (citing *Schneckloth*, 412 U.S. at 227). Finally, despite the presence of several police officers at the scene when Benjamin provided his consent to search, under the totality of the circumstances the Court does not find this factor to evince involuntariness on Benjamin's part because there is no evidence that the officers' mere presence transformed Benjamin's encounter with them into a coercive one. The encounter with the officers was short, lasting only several minutes, and none of the officers touched Benjamin, accused him, threatened him, or drew their weapons. Further, the tone of the encounter was conversational, there was no repeated or prolonged questioning of Benjamin, and Benjamin was asked to cooperate and consent to the search while he was on his own property. *See United States v. Price*, 558 F.3d 270, 279 (3d Cir. 2009) (finding that the consent to search the house given by the defendant's wife was voluntary because, among other things, she was on her property when she was asked for consent and the police officers who were present at the scene did not have their guns drawn, did not threaten, coerce, arrest, handcuffed, or even touched defendant's wife, and did not subject her to prolonged questioning).

Because the Court finds that the Government has shown by a preponderance of the evidence that Benjamin had the authority to consent to a search of the premises and that Benjamin voluntarily consented to the search, the search of the property conducted here did not violate the Fourth Amendment. Accordingly, Benjamin's Motion to Suppress Tangible and Derivative Evidence (Dkt. No. 27) will be denied.

### III.    DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

In his Motion to Suppress, Benjamin argues that all statements made by him must be suppressed as they were taken in violation of *Miranda*. (Dkt. No. 67 at 10-16). Benjamin asserts "that he was 'in custody' and 'subject to interrogation' throughout his interactions with [law enforcement officers] on February 14, 2017." *Id*. at 11. Moreover, Benjamin argues that to the extent that the Government alleges he waived his *Miranda* rights, he did not do so knowingly. intelligently, and voluntarily. *Id*. at 16-18.[14]

In its opposition, the Government counters that, with only one exception, "any statements made by the [D]efendant were voluntary and/or were provided after *Miranda* warnings were provided and waived." (Dkt. No. 74 at 1).[15] Further, the Government contends that Benjamin was not subject to custodial interrogation during the entirety of his interaction with law enforcement. *Id*. at 4. The Government also challenges Benjamin's attempt to cast doubt on whether the *Miranda* warnings were even administered by arguing that the record is clear that SA Latchman read the Advice of Rights form to Benjamin, and that Benjamin read them for himself upon the parties' arrival at the DEA office. *Id*. at 4-5. Accordingly, the Government maintains that any statements Benjamin made after he was provided his *Miranda* rights should not be suppressed because the record shows that "[D]efendant understood and waived those rights." *Id*. at 5.

---

[14]  The Court notes that many of Defendant's arguments in his Motion to Suppress Statements are similar to those he made in his Motion to Suppress Tangible and Derivative Evidence, discussed in the previous section.

[15]  The Government concedes that Defendant was in custody for purposes of *Miranda* after the officers located the marijuana plants and SA Latchman advised Defendant that he would be placed under arrest. (Dkt. No. 74 at 4). The Government further concedes that because Defendant was in custody and not yet *Mirandized* when he and SA Latchman entered the residence, Defendant's statement claiming that the marijuana was his (after SA Latchman pointed out the vials on the floor) should be suppressed. *Id*.

As discussed below, the Court finds that Defendant was not subjected to a custodial interrogation prior to his arrest. Accordingly, suppression is not warranted for any statements made by Benjamin prior to that point. The Court further finds that Benjamin knowingly, intelligently, and voluntarily waived his *Miranda* rights prior to being questioned by SA Latchman in the police vehicle. Thus, suppression is also unwarranted for any statements Benjamin made in response to SA Latchman's questions. Finally, as the Government has conceded that Benjamin's statement while inside the residence—i.e., claiming ownership of the marijuana vials on the floor—should be suppressed, Benjamin's request to suppress this statement is moot.

### A.    Applicable Legal Principles

The Fifth Amendment's Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. The "procedural safeguards"—commonly known as *Miranda* warnings—require that a suspect be advised prior to questioning that:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting *Miranda*, 384 U.S. at 479). *Miranda*'s holding is based on a recognition that "interrogation in certain custodial circumstances is inherently coercive," and suspects must therefore be "specifically informed of [their] *Miranda* rights and freely decide[] to forgo those rights" to ensure that the right against compulsory self-incrimination is preserved. *New York v. Quarles*, 467 U.S. 649, 654 (1984). *Miranda* warnings are

required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the Government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion). "[T]he presence of both a custodial setting and official interrogation is required to trigger *Miranda* warnings, therefore, in the absence of one or the other, *Miranda* is not implicated." *Gov't of Virgin Islands v. Christopher*, 990 F. Supp. 391, 395 (D.V.I. 1997); *see also Alston*, 34 F.3d at 1244 (same); *United States v. Mattox*, 2018 WL 3622777, at *3 (M.D. Pa. July 30, 2018) (same); *United States v. Mejia*, 2016 WL 7191630, at *19 (D.V.I. Dec. 10, 2016) (same); *Booker v. United States*, 2010 WL 2985982, at *12 (D.N.J. July 26, 2010) (same).

A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (internal citation and quotation marks omitted). "[T]he determination of custody is an objective inquiry (that is, what a reasonable person would believe)" in which courts ask "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave." *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (internal quotations omitted) (emphasis removed)). In order to conclude that a person who has not been arrested is in custody, "'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (quoting *Steigler,* 496 F.2d at 799 (internal quotations omitted)). "[T]he relevant environment [must] present[] the same inherently coercive pressures as the type of station house questioning at issue

in *Miranda*." *United States v. Arena*, 629 F. App'x 453, 457 (3d Cir. 2015) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). Custody determinations for *Miranda* purposes are "made on a case-by-case basis" by considering "the totality of the circumstances." *United States v. Killingsworth,* 118 F. App'x. 649, 650 (3d Cir. 2004) (citing *Stansbury v. California,* 511 U.S. 318, 325 (1994)).

The second prong of the *Miranda* analysis requires that the defendant be interrogated by the government. An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

Statements obtained in violation of *Miranda* are inadmissible at trial. *See Michigan v. Mosely*, 423 U.S. 96, 100 (1975). "Once a defendant challenges the admissibility of any statements made while in custody, the government must prove [by a preponderance of the evidence] that the defendant was advised of and understood [his] *Miranda* rights and that he [] validly waived those rights." *United States v. Briscoe*, 69 F. Supp. 2d 738, 741 (D.V.I. 1999), *aff'd in part, rev'd in part on other grounds*, 234 F.3d 1266 (3d Cir. 2000). This has been characterized by the Supreme Court as a "heavy burden." *United States v. Boyce*, 2015 WL 856943, at *7 (D.V.I. Feb. 26, 2015) (citing *Miranda,* 384 U.S. at 475); *see also North Carolina v. Butler,* 441 U.S. 369, 373 (1979) (stating that "the prosecution's burden is great"). A person may waive his or her *Miranda* rights if the waiver is made "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444; *see also United States v. Stuckey,* 441 F.2d 1104, 1105 (3d Cir. 1971).

B.     **Analysis**

1.     **Defendant's Statements Prior to the Discovery of Marijuana**

The Court first examines Benjamin's interaction with officers prior to the discovery of the marijuana and whether Benjamin was subject to a custodial interrogation for purposes of *Miranda* during this encounter so as to warrant suppression of the statements he made to law enforcement. The Court concludes that Benjamin was not in custody for *Miranda* purposes and therefore the statements will not be suppressed.

a.     **Custody**

The initial step in determining whether a person is in custody "is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (internal citations and quotation marks omitted) (brackets in original). The Third Circuit has identified several factors that courts should weigh in determining whether an individual is "in custody" during questioning for purposes of the *Miranda* analysis. These include:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*Willaman*, 437 F.3d at 359-60. Courts should also consider "the information known by the officer[s] concerning the suspect's culpability," *Jacobs*, 431 F.3d at 105 (citing *Steigler*, 496 F.2d at 799), and "whether the officer[s] revealed [their] belief that the suspect was guilty." *Id.* (citing *Stansbury*, 511 U.S. at 325).

With regard to the first factor, while there is no evidence that officers told Benjamin that he was free to leave, the record shows that Benjamin was not told that he was under arrest or that

he was not free to leave. *United States v. Harder*, 180 F. Supp. 3d 355, 363 (E.D. Pa. 2016) (finding that defendant was not in custody where "[n]o one told [d]efendant that he was under arrest or that he was not free to leave."); *see also Reinert v. Larkins*, 379 F.3d 76, 86-7 (3d Cir. 2004) (finding defendant was not in custody even though "he was never told that he was free to leave or free not to answer questions."). Further, SA Latchman told Benjamin that he could "voluntarily provide [them] assistance," which conveyed the volitional nature of the encounter. *See Howes*, 565 U.S. at 509. Under the circumstances, the Court finds that this factor weighs against a finding that Benjamin was in custody.

The second factor, which concerns the location or physical surroundings of the interrogation, also weighs against a finding of custody. In *Willaman*, the Third Circuit found that "[w]hen a person is questioned *on his own turf* . . . the surroundings are not indicative of the type of inherently coercive settings that normally accompanies custodial interrogation." 437 F.3d at 360 (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)). Here, the encounter between Benjamin and the officers occurred on his property, specifically on his driveway and on the path towards the rear of the residence, i.e., Benjamin's *own turf.* Throughout the interaction with officers, Benjamin was surrounded by an open field, was unrestrained, and had unencumbered access to and from his residence. Accordingly, this second factor weighs against a finding of custody.

Third, the length of the exchange between Benjamin and SA Latchman prior to the discovery of the marijuana does not evince a custodial situation. The record shows that officers met with Benjamin's sister at the police station around 11:40 a.m. The Consent Form was signed at 12:15 p.m.—after officers had already searched the shed and after Benjamin went back to his residence to collect his personal items, but while the parties were still on Benjamin's property.

Therefore, only 35 minutes had elapsed from the officers' meeting with Benjamin's sister to the culmination of the officers' search of the property, indicating that the initial encounter between the officers and Benjamin, i.e., when Benjamin agreed to cooperate, consented to the search, and acknowledged the existence of the marijuana plants, could only have lasted a few minutes at most. Since "courts have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial," *Killingsworth*, 118 F. App'x at 651–52 (listing cases), such a brief encounter as occurred here does not support a finding of custody.

Fourth, the record does not support a finding that the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraints during their encounter with Benjamin. SA Latchman testified that there was no point where officers yelled at Benjamin, raised their voices, brandished their weapons, used physical force against Benjamin, physically or verbally restrained him, or blocked his path as he moved around. *United States v. Savage*, 677 F. Supp. 2d 756, 763 (E.D. Pa. 2009) (finding defendant was not in custody where defendant, among other things, was not verbally or physically restrained by officers; the parties were in a residential hallway; and the officers did not raise their voices, display their weapons, or block defendant's movements).[16] Moreover, while the Court credits the fact that Benjamin was "consistently outnumbered" by five to seven officers as they traversed his property, and that this may suggest a coercive atmosphere, there is no showing in the record that the officers' presence effectively transformed the environment into one possessing "the same inherently coercive pressures as the

---

[16] While Benjamin contends that his "egress was effectively blocked by the multiple officers on the path leading to the shed," (Dkt. No. 67 at 12), the evidence in the record shows that the path was not the only ingress or egress to the rear of the house. SA Latchman testified that while the path was indeed "the easiest way in and out of that [] shed," it was not the only access point as Benjamin "could have easily walked on the grass" or "[go] around the other way" towards the back of the house. Accordingly, the Court finds that Benjamin's argument does not negate the non-coercive aspects of the encounter.

type of station house questioning at issue in *Miranda*." *Arena*, 629 F. App'x at 457; *accord United States v. Kofsky*, 2007 WL 2480971, at \*27 (E.D. Pa. Aug. 28, 2007) (finding that while the presence of 23 armed federal agents may function as one indicia of coercion, it "did not convert the interview of [defendant] into a custodial interrogation."). Here, Benjamin remained unrestrained even after SA Latchman saw the shed and surmised that it may contain a marijuana growth operation, and while the officers cleared and searched the building. Thus, this factor weighs against a finding of custody.

Fifth, the Court finds that Benjamin's encounter with law enforcement prior to the discovery of the marijuana was consensual. SA Latchman testified that upon informing Benjamin of the reason why the officers were there, Benjamin affirmatively agreed to cooperate and consented to a search. Without prompting or requests from the officers, Benjamin led them down a path towards the rear of the residence. Upon arriving at the shed, Benjamin unlocked the door, again without any prompting or requests from the officers. Benjamin then agreed to allow the officers to enter the shed first. Accordingly, the evidence in the record supports a finding that Benjamin's initial encounter with law enforcement was consensual.

The Court dismisses Benjamin's other assertions which he claims are indicia of custody. The Court finds no merit for custody purposes in Benjamin's argument that the officers used his sister as a "ruse to coerce him into leaving his home and speaking with them." (Dkt. No. 67 at 11-12). As discussed above, there is no evidence in the record demonstrating that the presence of Benjamin's sister somehow *compelled* Benjamin to come out of his house and speak with the officers. Nor does the Court find that the presence of Defendant's sister created the type of coercive atmosphere that would make a reasonable person in Benjamin's position feel that he was "not at liberty to terminate the interrogation and leave." *Jacobs*, 431 F.3d at 105. Further, even if the Court

credits that such use of Benjamin's sister was indeed a deliberate ruse on the part of the officers, such conduct did not cross the line so as to be considered coercive and to place Benjamin in a custodial setting. *See United States v. Little*, 2007 WL 1853975, at *1-4 (E.D. Pa. June 26, 2007) (finding that defendant's argument that he was in custody for purposes of *Miranda* was unavailing where Secret Service agents asked his probation officer to have defendant meet him at his office and the agents then interviewed defendant without prior notice that they would be there); *see also United States v. Laurita*, 821 F.3d 1020, 1026 (8th Cir. 2016) ("The use of deception is irrelevant unless it relates to a reasonable person's perception of his freedom to depart.") (internal citation omitted).

The Court also does not credit Benjamin's argument that, because the officers "uncontroverted[ly] [] believed that [he was] guilty of the manufacture of marijuana" upon reaching the shed, this demonstrated the custodial nature of his encounter with the officers. (Dkt. No. 67 at 12). In *Christopher*, the defendant, who was charged with possession of a firearm, moved to suppress statements and the weapon obtained by the police. The court found that "[e]ven when [defendant] . . . became a definite suspect in the [officers'] minds, *Miranda* warnings were not required . . . [because] any inquiry into whether the officers have focused their suspicions upon the individual being questioned is not relevant for purposes of *Miranda*." 990 F. Supp. at 395. The only instance when an officer's subjective belief is of any significance to a custody determination is when the officer "convey[s], by word or deed, to the individual being questioned" his or her suspicions about the latter's culpability, and by doing so, "affected how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury*, 511 U.S. at 325. The Supreme Court emphasized that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating

officers or the person being questioned." *Id*. at 323. Similarly here, even assuming that SA Latchman, upon reaching the shed, had formed an opinion about Benjamin's involvement in the marijuana operation, his belief has no bearing on the determination of whether Benjamin was in custody because there is no evidence that SA Latchman conveyed to Benjamin that he was a suspect.

In view of the foregoing, the Court finds that the Government has shown by a preponderance of the evidence that, under the totality of the circumstances, Benjamin was not in custody during his encounter with law enforcement prior to the discovery of the marijuana in the shed. On this ground alone, Defendant's motion to suppress statements made by Benjamin prior to the discovery of the marijuana must be denied.

### b.  Interrogation

Because the presence of both a custodial setting and an interrogation is necessary to trigger *Miranda*, *Christopher*, 990 F. Supp. at 395; *see also Alston*, 34 F.3d at 1244; *Mejia*, 2016 WL 7191630 at *19; *Mattox*, 2018 WL 3622777 at *3; *Booker*, 2010 WL 2985982 at *12, the Court's finding that Benjamin was not in custody is sufficient to defeat his claimed *Miranda* violation. Thus, the Court need not address the interrogation prong.

In any event, even if the Court were to consider whether Benjamin was subjected to an interrogation, the Court would find in the negative. First, nothing in the record shows that an "express questioning" of Benjamin or its "functional equivalent" took place during his initial encounter with authorities. Law enforcement's request for cooperation in a criminal investigation is not considered an interrogation. *Christopher*, 990 F. Supp. at 394.

Second, the Court finds no merit in Defendant's argument that SA Latchman's request to allow officers to enter the shed first is an interrogation because the request required that Benjamin

"admit to some possessory interest in the shed" and thus sought "an inherently incriminating response." (Dkt. No. 67 at 14). "The protections of the Fifth Amendment only apply to incriminating evidence of a testimonial or communicative nature." *United States v. Cooney*, 26 F. App'x 513, 523 (6th Cir. 2002) (citing *Schmerber v. California,* 384 U.S. 757, 760–65 (1966)). SA Latchman's request to allow officers to enter the shed first is akin to a request to search the shed. A majority of circuit courts which have considered the matter have found that a request to search is not an interrogation because a consent to search is not an incriminating statement under the Fifth Amendment due to its non-testimonial and non-communicative nature. *United States v. Smith,* 3 F.3d 1088, 1098 (7th Cir. 1993); *see also United States v. Calvetti*, 836 F.3d 654, 663 (6th Cir. 2016), *cert. denied,* 137 S. Ct. 1597 (2017) (listing cases). Further, the fact that the search itself leads to incriminating evidence or that officers, when making a request to search, believe that incriminating evidence will be found at the location does not convert a consent to search into a testimonial statement. *See Schmerber*, 384 U.S. at 764; *United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir. 1996).

Similarly, SA Latchman's request for Benjamin to sign the Consent Form cannot be considered an interrogation as his Consent Form is not testimonial evidence. *See United States v. Hidalgo*, 7 F.3d 1566, 1568 (11th Cir. 1993). There is no qualitative difference between the verbal consent that Benjamin provided prior to the search of the shed and his later signing of the consent form, which merely memorialized Benjamin's verbal consent. Neither instance could be characterized as testimonial or communicative evidence. *See Cooney*, 26 F. App'x at 518-523 (finding that defendant's voluntary signing of the consent to search form—after she had orally consented to a search of the house whereby officers seized incriminating evidence—was not in

violation of her Fifth Amendment rights because consent is not evidence of a testimonial or communicative nature.).

Finally, Benjamin's cited cases are inapposite as they implicate the Sixth Amendment wherein defendants had invoked their right to counsel but officers still persisted in their questioning and ultimately obtained a consent to search from the defendant. *See e.g., United States v. Fleming*, 31 F. Supp. 2d 3, 5 (D.D.C. 1998); *United States ex rel. Daley v. Yeager*, 415 F.2d 779 (3d Cir. 1969); *Hall v. Iowa*, 705 F.2d 283, 290 & n.6 (8th Cir. 1983); and *United States v. Schultz*, 1980 WL 626255, at *2 (D.V.I. July 30, 1980). These circumstances do not exist here.

In short, the Government has shown by a preponderance of the evidence that no interrogation occurred for purposes of *Miranda*. This independent ground provides an additional basis for the denial of Defendant's motion to suppress Benjamin's statements made prior to the discovery of the marijuana.

### 2. Defendant's Post-Arrest Statements

The other statements Benjamin seeks to suppress were those that he made after he was arrested, handcuffed, and placed inside a police vehicle to be transported to the DEA office. SA Latchman testified that after he read Benjamin his *Miranda* rights, Benjamin waived his rights and proceeded to answer questions about the marijuana growth operation. Thus, at issue here is whether, under the totality of the circumstances, the Government has shown by a preponderance of the evidence that Benjamin waived his rights knowingly, intelligently, and voluntarily. Based on the evidence presented, the Court answers this question in the affirmative.

Two factors affect the determination of whether *Miranda* rights have been voluntarily, knowingly, and intelligently waived:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than

> intimidation, coercion, or deception. Second, the waiver must have been
> made with a full awareness of both the nature of the right being abandoned
> and the consequences of the decision to abandon it. Only if the *"totality of
> the circumstances* surrounding the interrogation" reveal both an uncoerced
> choice and the requisite level of comprehension may a court properly
> conclude that the *Miranda* rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 421 (1986) (internal citation omitted) (emphasis added).

Specifically, in analyzing the totality of the circumstances, courts must consider "the background,

experience, and conduct of the [defendant], as well as any indicia of coercion." *Briscoe*, 69 F.

Supp. 2d at 741. "Examples of 'traditional' indicia of coercion are 'the duration and conditions of

detention, the attitude of the interrogators, defendant's physical and mental state, and other

pressures affecting defendant's powers of resistance and self-control.'" *United States v. Rose*, 189

F. Supp. 3d 528, 536 (D.V.I. 2016) (citing *Briscoe*, 69 F. Supp. 2d at 741 n.1). But, "a necessary

predicate to a finding of involuntariness is coercive police activity. Further there must be some

causal connection between the police conduct and the confession." *Jacobs*, 431 F.3d at 108

(internal citation omitted); *Colorado v. Connelly*, 479 U.S. 157, 164-67 (1986) (a statement is

involuntary if it is the product of overreaching police conduct). "*Miranda* rights will be deemed

waived only where the totality of the circumstances 'reveals both an uncoerced choice and the

requisite level of comprehension.'" *United States v. Sriyuth*, 98 F.3d 739, 749 (3d Cir. 1996)

(quoting *Alston*, 34 F.3d at 1253) (quotations and brackets omitted). "The court is charged with

reviewing the credibility of the witnesses and the weight given the evidence, together with the

inferences, deductions and conclusions to be drawn from the evidence." *United States v. Evans*,

2008 WL 2942141, at *3 (D. Del. July 30, 2008) (internal citations and quotation marks omitted).

　　　First, the Court credits SA Latchman's testimony that, while they were in the vehicle, he

read the *Miranda* warnings out loud to Benjamin from the Advice of Rights form; that he provided

a copy of the form to Benjamin upon their arrival at the DEA office; that Benjamin read the form

for himself; and that Benjamin signed the form. These findings are buttressed by Benjamin's signature, and the "x" marks that were placed in the waiver section of the Advice of Rights form affirming that Benjamin "read [the form] or someone has read to [Benjamin] this advice of rights[.]" (Gov't Ex. No. 2). The Court also credits SA Latchman's testimony that when he was finished reading the *Miranda* warnings in the vehicle, Benjamin answered in the affirmative to the questions: (1) Do you understand your rights? and (2) Are you willing to answer some questions?.

The Court discounts as immaterial Benjamin's argument that SA Latchman's failure to check off each *Miranda* warning on the Advice of Rights form to confirm that Benjamin did indeed waive each right as they were being administered to him, and his failure to get a separate affirmative answer to each question, somehow rendered Benjamin's waiver involuntary. (Dkt. No. 67 at 17). *See Evans*, 2008 WL 2942141 at *2-4 (finding that defendant voluntarily waived his *Miranda* rights even though the police only read the warnings out loud to defendant and did not provide defendant with a waiver form, and police did not ask defendant whether he understood "each individual right" and instead took defendant's lone affirmative response as a confirmation that defendant understood that he had waived his rights). Also, contrary to Benjamin's argument, the fact that the Advice of Rights form was not given to Benjamin until after his rights were verbally administered and he was questioned is of no import. "[While] an express written or oral statement of a waiver . . . is usually strong proof of the validity of that waiver, [] [it] is not inevitably either necessary or sufficient to establish waiver." *Butler*, 441 U.S. at 373. "Verbal statements by a suspect acknowledging an understanding of his Miranda rights followed by the suspect's answering questions can qualify as an implicit waiver of protections, thus satisfying the constitutional safeguards established in *Miranda*." *Evans*, 2008 WL 2942141 at *4; *accord United States v. Velasquez*, 626 F.2d 314, 320 (3d Cir. 1980) ("[defendant's] subsequent willingness to

answer questions after acknowledging that she understood her Miranda rights is sufficient to constitute an implied waiver[.]"). In view of the fact that forms are not even necessary, the fact that the Advice of Rights form was provided to Benjamin after he was orally advised of his rights and questioned is inconsequential.

Further, there is no evidence in the record which indicates that SA Latchman forced Benjamin to sign the Advice of Rights form waiving his rights. Nor is there evidence that Benjamin was forced to answer questions or that Benjamin was threatened in any way to give up his rights. SA Latchman testified that he did not tell Benjamin that he had to sign the form, nor did he threaten Benjamin in any way to get Benjamin to waive his rights and agree to speak with him. *See United States v. Savage*, 2012 WL 5881852, at *6 (E.D. Pa. Nov. 20, 2012) (finding that statements made while handcuffed in back of police car were voluntary in part because there was no indication that defendant felt threatened).

 Moreover, as previously discussed, there is nothing in the record to suggest that SA Latchman's questioning of Benjamin was overly long or any evidence that there was "[] repeated or prolonged questioning of Defendant[.]" *United States v. Harris*, 2013 WL 1828549, at *16 (W.D. Pa. Apr. 30, 2013). Instead, the evidence showed that the Consent Form—which, according to SA Latchman, was signed at Benjamin's residence prior to his transport to the DEA office—was signed at 12:15 p.m. The Advice of Rights form—which was signed at the DEA office—shows it was signed at 12:25 p.m. This suggests that SA Latchman's questioning, which occurred during Benjamin's transport to the office, must have lasted no longer than approximately 10 minutes. In addition, the waiver section of the Advice of Rights form, which Benjamin signed, contained the statement: "At this time, I am willing to freely and voluntarily answer questions without a lawyer present." (Gov't Ex. No. 2).

These circumstances support a finding of a voluntary waiver. *See e.g., United States v. Herrera-Genao*, 419 F. App'x. 288, 292-94 (3d Cir. 2011) (upholding district court's finding that defendant was properly advised of his *Miranda* rights where there was testimony that "[defendant] was brought to interrogation, verbally advised as to his *Miranda* rights, and then given a Statement of Rights, which he reviewed and signed"); *United States v. Andrews*, 231 F. App'x 174, 176–77 (3d Cir. 2007) (finding defendant's statements voluntary when police advised defendant of his *Miranda* rights and gave defendant a written copy of the *Miranda* warnings); *Velasquez,* 626 F.2d at 320 (providing that a defendant who answers questions after being advised of her rights may be deemed to have waived her rights); *see also United States v. Whitfield*, 2013 WL 1905112, at *2-3 (E.D. Pa. May 8, 2013) (finding that defendant's *Miranda* waiver was made voluntarily where, *inter alia*, defendant did not indicate "he did not understand the rights of which he was advised").

To prove a valid *Miranda* waiver, the Government also bears the burden of proving Benjamin waived his rights "knowingly" and "intelligently," i.e., that he understood his *Miranda* rights and the consequences of waiving them. *Colorado v. Spring*, 479 U.S. 564, 573-74 (1987). The Government met this burden through testimony and documentary evidence which established that: SA Latchman read the *Miranda* rights to Benjamin; Benjamin responded affirmatively when asked if he understood his rights and was willing to answer questions; Benjamin read the Advice of Rights form himself; Benjamin signed the form, with indications on the form that he read and someone read the form to him, and he understood his rights and was willing to answer questions. (Gov't Ex. No. 2). In the face of this evidence, there was nothing in the record which suggested that Benjamin's "background, experience, intelligence . . . and conduct" impaired his ability to understand his *Miranda* rights or the consequences of waiving them. *United States v. Scotland*, 2014 WL 2149644, at *3 (D.V.I. May 22, 2014) (citing *Moran,* 475 U.S. at 421); *see also*

*Patterson v. Ill.*, 487 U.S. 285, 294 (1988) (finding that reading an accused his *Miranda* warnings provides the accused with knowledge of the consequences of waiving these rights); *Alston*, 34 F.3d at 1253 (finding that defendant "understood his *Miranda* rights when he signed the waiver," based on defendant's execution of the form "and the testimony of the interrogating officers concerning their recitation of the rights and [defendant's] acknowledgement that he understood them"); *United States v. Phuong Le*, 2011 WL 913260, at *3 (E.D. Pa. Mar. 11, 2011) (*"If the totality of the circumstances surrounding the interrogation demonstrates that the defendant had the required level of comprehension, a court may properly conclude that the waiver was knowing and intelligent."*).

Moreover, the Court notes that not only was Benjamin able to make the decision to waive his *Miranda* rights while inside the vehicle, he also made the decision to decline to have his interview recorded—a decision which he reiterated at the DEA office when he signed the Recording Declination form and underlined the statement "I do not want my interview to be audio or video recorded." (Gov't Ex. No. 3). This evinced Benjamin's ability to comprehend what was being asked of him throughout his encounter with the officers.[17]

---

[17] Benjamin also argues that he could not have validly waived his rights prior to his interrogation when SA Latchman "failed to explain what types of questions would be asked in sufficient detail for [Benjamin] to knowingly waive his rights," and failed to confirm that Benjamin wanted to "freely and voluntarily answer questions without a lawyer present," as was stated in the waiver section. (Dkt. No. 67 at 17). The Court does not give any credence to these arguments. As to the first argument, Defendant—not surprisingly—provides no legal authority for the proposition that, beyond administering the *Miranda* rights, law enforcement must describe the types of questions they expect to ask in order to procure a valid *Miranda* waiver for Defendant. The Court is unaware of any such requirement or any authority to that effect. As for the latter argument, the evidence shows that, in verbally administering the *Miranda* warnings to Benjamin, SA Latchman stated, "[y]ou have the right to have a lawyer with you during questioning," (Gov't Ex. No. 2), and that Benjamin waived that right. Thus, as reflected on the Advice of Rights form, Benjamin agreed to "freely and voluntarily answer questions without a lawyer present." *Id*.

Considering the totality of the circumstances, the Court finds that SA Latchman's reading of rights out loud to Benjamin showed a sufficient administration of the *Miranda* warnings and that Benjamin—by affirmatively stating that he understood and waived these rights, proceeding to respond to SA Latchman's questioning, and subsequently signing the *Miranda* waiver form— made a voluntary, knowing, and intelligent waiver of his *Miranda* rights. Accordingly, Benjamin's motion to suppress statements he made after his arrest and when he was questioned in the police vehicle will be denied.

## IV.     CONCLUSION

In view of the foregoing, the Court will deny Defendant Benjamin's "Motion to Suppress Tangible and Derivative Evidence" and "Motion to Suppress Statements," except for the statement Benjamin made in the residence claiming ownership of the marijuana which the Government conceded should be suppressed.

An appropriate Order accompanies this Memorandum Opinion.

Date: December 30, 2018
                                                    _____/s/_____
                                                    WILMA A. LEWIS
                                                    Chief Judge